IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CopyWatch, Inc.<br>48 River Road<br>Barryville, New York 12719,<br><br>        Plaintiff,<br><br>   v.<br><br>American National Red Cross<br>2025 E. Street, NW<br>Washington, D.C. 20006,<br><br>        Defendant. | Civil Action No. |

## COMPLAINT

Plaintiff CopyWatch, Inc. ("CopyWatch"), for its Complaint against Defendant American National Red Cross ("ARC"), states as follows:

### NATURE OF THE ACTION

1.      This action arises out of ARC's unlawful use of CopyWatch's confidential and proprietary assessment of ARC's copier and printer lease and maintenance agreements, supply costs, and volume requirements, and CopyWatch's confidential and proprietary strategies to reduce document expenses, to achieve more than $15 million in document expenses without any compensation to CopyWatch.

2.      CopyWatch is a husband and wife owned small business that provides expert and proprietary document expense reduction services.  CopyWatch saves its clients money by restructuring their copier, multi-functional and printer purchasing into a streamlined program using its unique DocuWatch™ system.  Unlike its clients, CopyWatch deals with the document

production industry every day. It has a knowledge of the document production industry, technology, prices, and suppliers, to which few, if any, have access.

3. Since 1991, CopyWatch has used its expertise and its confidential and proprietary methods to achieve hundreds of millions of dollars of savings on copying and printer expenses for its clients, including The Bank of New York, the Federal Reserve Bank of NY, FannieMae, Merck & Co., Sony Music & Entertainment, Deloitte & Touche, Barclays Mercantile Credit, Visa, and Reuters. When it provides its services, CopyWatch's clients pay a success based fee– typically 30%–of the savings its analysis and strategies achieve.

4. ARC invited CopyWatch to assess its document expenses. ARC exploited CopyWatch's expertise, CopyWatch's confidential and proprietary audit and analysis of ARC's document expenses; CopyWatch's confidential and proprietary identification of where ARC could reduce costs; and CopyWatch's confidential and proprietary strategies to achieve copying costs by several million dollars. But ARC has not paid CopyWatch a cent for this work.

## THE PARTIES

5. Plaintiff CopyWatch is a corporation organized under the laws of New York with its principal place of business at 48 River Road, Barryville, New York 12719.

6. Defendant ARC is a non-profit corporation charted by an act of Congress with principal offices in the District of Columbia, having an office at 2025 E Street, NW, Washington, D.C. 20006.

7. ARC has more than $3.2 billion in assets and has annual revenues of more than $2.7 billion.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as a result of the diversity of the parties and pursuant to the Court's supplemental

jurisdiction under 28 U.S.C. § 1367(a).  The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

9.      This Court has personal jurisdiction over the Defendant because its principal place of business is within the District of Columbia; it has conducted, engaged in, and carried out business within the District of Columbia; and it has engaged in substantial and not isolated activity within the District of Columbia.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

11.     Founded more than two decades ago, CopyWatch is an industry leader in document expense auditing.  CopyWatch provides services as an independent cost-savings specialist to reduce document production expenses.

12.     CopyWatch's President, Matthew Smith, first became involved in document expense savings when he became aware of the excessive prices his son's elementary school was being charged for copying services by Xerox.  Along with his wife, Smith began researching copying contracts in New York City's public schools and found that the majority of schools had entered into overly expensive copying contracts.  Smith and his wife worked to negotiate a lower-cost contract for his son's school.  From this experience, Smith launched a business performing document expense savings.

13.     CopyWatch has provided its services to achieve hundreds of millions of dollars in savings to more than 1,200 clients in the United States, England, Wales, Scotland, Ireland, and Australia.

14.     CopyWatch's methods involve the use of a confidential and proprietary copyrighted audit and document management process to assess an organization's document expenses including copier and printing contracts.  CopyWatch's audit of disparate printing and copying cost information (including lease agreement terms, maintenance agreement terms, supply agreement terms, and volume requirements) across the entire organization results in a metric to compare against organization of comparable size and document needs.  This allows CopyWatch to identify how much its client is being overcharged.  CopyWatch then identifies the specific drivers of the overcharges, and using its industry expertise and relationships, recommends and implements strategies to achieve substantial savings for its clients.

15.     CopyWatch is compensated through success fees based on the amount of savings it is able to generate for its clients from its audit and expense reduction strategies.  CopyWatch earns a percentage—typically 30%—of the cost savings achieved by its clients.

16.     To identify and secure potential clients, CopyWatch sometimes relies on agents. If an agent assists CopyWatch with entering into an engagement, CopyWatch typically splits its fee on that project with the agent.

17.     One of CopyWatch's agents is Martin Luther King III.  Mr. King helped facilitate the introduction of CopyWatch to ARC and ARC's Vice President for Humanitarian IT Services, Rod Tolbert.

18.     After an initial introductory call, Mr. Tolbert delegated further discussions between ARC and CopyWatch to ARC's IT Procurement leader, Michael Macon.

19.     Mr. Macon then coordinated an in-person meeting between CopyWatch and ARC on June 22, 2015.

20.     In advance of the meeting, CopyWatch and ARC entered into a Non-Negotiable Confidential Disclosure Agreement ("NDA").

21.     The NDA governs the disclosure of CopyWatch's confidential information to ARC ("the Confidential Information").

22.     In the NDA, ARC and its representatives agreed not to disclose the Confidential Information to others.  ARC also agreed to use the information only "to the extent necessary to advance the goal of exploring business opportunities of mutual interest" with CopyWatch (the "Purpose").

23.     The NDA also provides that: "Title and all rights to possess and exploit the Confidential Information shall remain the property of the Discloser."

24.     Mr. Macon continued to take the lead from ARC's side on further discussions between ARC and CopyWatch.

25.     On August 10, 2015, CopyWatch and ARC agreed that CopyWatch would provide an audit of ARC's document expense costs for all copiers, copiers, multi-functional devices, and printers.  The audit would include an in depth analysis of all billing plus recommendations that will ensure savings and recoveries going forward.

26.     The results of the audit would be provided to ARC in a written report detailing ARC's copying costs, the estimated amount of copier/document expenses that CopyWatch maintains ARC is being overcharged, CopyWatch's recommended strategies and actions to achieve savings, and the amount of savings that CopyWatch could achieve for ARC if CopyWatch implemented its recommended strategies and actions.

27.     ARC acknowledged that through this audit, CopyWatch would be disclosing its Confidential Information to ARC, and ARC expressly agreed that such information would be handled in accordance with the NDA.

28.     CopyWatch continued investing substantial time and effort to perform its audit of ARC's document expenses.

29.     On August 10, 2015, CopyWatch sent a proprietary spreadsheet for ARC to distribute to its incumbent copier and printer vendors to collect the information for the audit. ARC used the CopyWatch spreadsheet to collect information from vendors such as Ricoh to be analyzed by CopyWatch.

30.     After analyzing for ARC the initial information provided by ARC's vendors, CopyWatch also prepared follow up questions for ARC to ask its vendors such as Konica.  ARC sent those questions to Konica and provided Konica's responses to CopyWatch.

31.     When necessary, CopyWatch also made contact with key executives at copier and printing vendors on behalf of ARC in order to obtain sufficient information from the vendors for CopyWatch's audit and analysis.  CopyWatch and ARC's vendors kept ARC informed of these discussions.

32.     After collecting information concerning ARC's leases, maintenance agreements, supplies, and vendor requirements, CopyWatch conducted an analysis of the information.

33.     On October 26, 2015, following the completion of its audit, CopyWatch provided a confidential Document Expense Audit Report to ARC (the "Report").  The Report explicitly states that "[t]he information in this communication, including all attachments, is confidential."

34.     In the Report, CopyWatch provided a complete and detailed assessment of ARC's copier and printer lease and maintenance agreements, including identifying the areas where CopyWatch's analysis found excessive and unnecessary copying costs.

35.     Specifically, using CopyWatch's proprietary analysis, CopyWatch was able to take disparate data points (including lease, maintenance, supplies and volume information) and provide ARC with an all-in cost-per-copy (CPC) metric throughout the organization. CopyWatch's CPC metric enables CopyWatch to evaluate and compare its clients' copying costs with other organizations with similar equipment and volume requirements.

36.     As set forth in the Report, using the CPC that CopyWatch derived from its analysis of ARC's leases, maintenance agreements, supply contracts, and volume requirements, CopyWatch was able to determine that ARC's copying costs were substantially higher than the cost of other institutions with similar equipment and vendor requirements.

37.     Through its analysis of ARC's leases maintenance agreements, supply contracts and volume requirements, CopyWatch then also identified specific reasons for ARC's excessive copying costs and outlined those in the Report.

38.     CopyWatch then outlined in the Report the strategies CopyWatch would implement and the outcomes that CopyWatch could provide in order to enable ARC to simplify pricing, improve efficiency, ensure effective maintenance, and ultimately achieve aggregate savings of more than $20 million.

39.     Upon receiving the Report, ARC's Chief Information Officer, Ronnie Strickland thanked CopyWatch for the "great" report, asked CopyWatch several questions concerning how CopyWatch would execute its plan.  CopyWatch answered Mr. Strickland, providing further details concerning execution of the strategies outlined in the Report and indicated that he would

send a draft lease buyout letter for ARC to send to its current vendor Konica Minolta, and provided contact information for Konica Minolta's Vice President of Sales for Enterprise Accounts to ensure the letter received the appropriate attention.

40.     After receiving the Report, Mr. Strickland also scheduled a call between ARC and CopyWatch.  In advance of the call, and as promised, CopyWatch sent ARC a draft lease buyout letter for ARC to send its current vendor Konica Minolta.

41.     On October 29, 2015, after its call with CopyWatch, ARC, through Mr. Macon, sent the lease buyout letter to Konica Minolta.

42.     From August through October 2015, Mr. Smith repeatedly spoke with Konica Minolta to negotiate more favorable pricing for ARC and reported on those conversations to ARC.

43.     On October 30, 2015, CopyWatch contacted Mr. Macon by email to finalize the terms of compensation for CopyWatch's work on behalf of ARC.

44.     On November 2, 2015, CopyWatch learned that Michael Macon was no longer with ARC.

45.     On information and belief, ARC fired Mr. Macon as part of its attempt to use CopyWatch's audit, analysis, strategies, and recommendations without compensating CopyWatch.

46.     After learning Michael Macon was no longer with ARC, CopyWatch sent a request to Mr. Strickland, Mr. Tolbert and Brian Yanni, ARC's Director for Decision Support and Business Planning that ARC finalize the terms of compensation for CopyWatch's work on behalf of ARC.

47.     Mr. Yanni scheduled a call with CopyWatch.  During that call, the parties discussed implementation of CopyWatch's confidential strategies to reduce ARC's document expenses.  After the call, Mr. Yanni outlined some of the points discussed on the call and raised further questions for CopyWatch to which CopyWatch responded in good faith.

48.     ARC, through Mr. Yanni and Mr. Strickland, continued to string CopyWatch along without finalizing the terms of compensation for CopyWatch's work for ARC.

49.     Further attempts by CopyWatch to finalize the terms of its compensation for its work were rebuffed by ARC.

50.     ARC at the same time began attempting without CopyWatch to make use of CopyWatch's confidential audit and to implement CopyWatch's confidential strategies outlined in the Report without permission from CopyWatch and without compensation to CopyWatch.  In doing so, ARC used CopyWatch's confidential information for a purpose other than business opportunities of mutual interest, thus violating the express terms of the NDA.

51.     In January 2016, Mr. Yanni of ARC made an unsolicited telephone call to Mr. Smith of CopyWatch, boasting that, since receiving CopyWatch's report, ARC had been able to drive down its cost-per-copy rate to 2.7 cents.

52.     Based on this figure, ARC used CopyWatch's confidential audit and strategies to achieve document expense savings of more than $15 million.

53.     Without CopyWatch's audit and strategies, ARC would not have achieved these cost savings.  Indeed, without CopyWatch's work, ARC would not have been aware that it was being overcharged for document expenses.

54.     On May 3, 2016, after being made aware of ARC's document expense cost savings, CopyWatch sent ARC an invoice for CopyWatch's services. CopyWatch requested its

fee of 30% as applied to the $15,464,038.21 in savings generated for ARC.  The fee amounted to $4,639,211.46.  CopyWatch requested that ARC pay one-third of the fee initially, and then pay the remainder in four equal payments per quarter.  CopyWatch offered a 10% discount if ARC paid the fee in full rather than in payments.

55.     ARC has failed to compensate CopyWatch for the cost savings it has accrued based on its implementation of the confidential cost savings audit and recommendations.  ARC continues to enjoy significant savings in document production expenses based on CopyWatch's work and confidential audit and strategies.

## COUNT I
## BREACH OF THE NON-DISCLOSURE AGREEMENT

56.     CopyWatch realleges and incorporates by reference paragraphs 1 through 53 as if restated in full.

57.     CopyWatch and ARC entered into the NDA, which governs the use of confidential information shared during the course of CopyWatch's audit and analysis of ARC's document expenses.

58.     The NDA imposes a duty on ARC to maintain the confidentiality of the information and use such only to further mutually beneficial business arrangements with CopyWatch.  The NDA also precludes ARC from exploiting CopyWatch's confidential information for its own use.

59.     ARC has breached its duty to maintain the confidentiality of CopyWatch's information and to use the information only to further a mutually beneficial business arrangement with CopyWatch.  Instead, ARC has exploited CopyWatch's confidential information for its own personal gain without permission from CopyWatch.

60.     As a legal result of ARC's conduct, CopyWatch has suffered pecuniary harm in the form of lost income for its auditing services.

## COUNT II
## BREACH OF IMPLIED-IN-FACT CONTRACT

61.     CopyWatch realleges and incorporates by reference paragraphs 1 through 58 as if restated in full.

62.     CopyWatch provided invaluable services to ARC by conducting an extensive audit of ARC's copying and document expenses, applying its confidential and proprietary methods, and providing a confidential and proprietary savings model able to reduce ARC's document expenses.

63.     The audit conducted by CopyWatch was provided solely for ARC's benefit. CopyWatch assessed ARC's copying and printing leases, maintenance arrangements, supply agreements, and purchase amortization contracts.  CopyWatch's services were clearly provided to ARC and were not intended to benefit any other business or organization.

64.     ARC accepted Copywatch's services, including the confidential audit results and strategies on how ARC could reduce its expenses, and negotiations with Konica Minolta on ARC's behalf.

65.     CopyWatch reasonably notified ARC of its fees for ARC's use of CopyWatch's audit and confidential and proprietary strategies.

66.     At all times, ARC understood that ARC's use of CopyWatch's audit and confidential and proprietary strategies was dependent on compensation to CopyWatch.

67.     ARC proceeded to use and exploit CopyWatch's audit and confidential and proprietary strategies to achieve millions of dollars in savings on its document expenses.

68.     ARC has not made any payment to CopyWatch for the valuable services CopyWatch provided to ARC.

## COUNT III
## UNJUST ENRICHMENT

69.     CopyWatch realleges and incorporates by reference paragraphs 1 through 66 as if restated in full.

70.     CopyWatch conferred a benefit on ARC by conducting an extensive audit of ARC's copying and document expenses, applying its confidential and proprietary methods, and providing a confidential and proprietary savings model to reduce ARC's document expenses.

71.     The value of the benefit conferred is the more than $15 million reduction in ARC's document expenses that ARC has retained without any compensation to CopyWatch.

72.     ARC's retention of the expense savings under these circumstances is unjust.

## DEMAND FOR JURY

CopyWatch demands a jury for all counts.

## PRAYER FOR RELIEF

WHEREFORE, CopyWatch respectfully requests that this Court enter judgment in favor of CopyWatch and against Defendant as follows:

    a.      awarding CopyWatch its actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

    b.      permanently enjoining ARC from engaging in the unjust activities described herein and provide restitutionary relief;

    c.      awarding CopyWatch its attorneys' fees and costs associated with this action to the highest extent permitted by law;

      d.     awarding CopyWatch prejudgment and post-judgment interest at the

highest legal rate to the extent provided by law; and

      e.     granting such further relief as may be just and proper.

Dated: June 21, 2017                 DENTONS US LLP


By: /s/ John W. Lomas, Jr.
    John W. Lomas, Jr., D.C. Bar No. 976555
    john.lomas@dentons.com

1900 K Street, NW
Washington, District of Columbia  20006
Telephone:      (202) 496-7500
Facsimile:      (202) 408-6399

Attorneys for Plaintiff CopyWatch, Inc.


Of Counsel:

Charles E. Dorkey III, D.C. Bar No. 928010
Dentons US LLP
1221 6th Ave
New York, New York  10020
charles.dorkey@dentons.com
Telephone:  (212) 768-6700