**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COPYWATCH, INC.,<br>*Plaintiff*,<br>v.<br>AMERICAN NATIONAL RED CROSS,<br>*Defendant*. | Civil Action No. 17-1219 (TJK) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff CopyWatch, Inc. ("CopyWatch") is a consulting firm that advises businesses how they can reduce their copying and printing expenses. CopyWatch claims that it provided such advice to Defendant American National Red Cross ("Red Cross"). According to CopyWatch, Red Cross improperly and unjustly used that advice without paying for it, in breach of express and implied agreements between the parties.

Red Cross has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that CopyWatch has failed to state a claim. ECF No. 15; *see also* ECF No. 15-1 ("Def.'s Br."); ECF No. 17 ("Pl.'s Opp'n"); ECF No. 18 ("Def.'s Reply"). For the reasons explained below, the motion is **DENIED**.

## I. Factual and Procedural Background

CopyWatch, a corporation headquartered and incorporated in New York, alleges that it is "an industry leader in document expense auditing and reduction services." ECF No. 13 ("Am. Compl.") ¶¶ 5, 11. It claims to have developed a "confidential and proprietary audit and document management process" that allows its clients to reduce their document-related expenses, including through its expertise in negotiating with vendors. *Id.* ¶¶ 13-15. CopyWatch

asserts that its customary fee is 30% of the cost savings achieved, which clients often prefer because "it does not require any new expenditures on their part." *Id.* ¶ 17.

Red Cross is a corporation chartered by Congress and headquartered in the District of Columbia. *Id.* ¶ 6; *see* 36 U.S.C. § 300101. In June 2015, CopyWatch personnel met with Red Cross's "IT Procurement leader," Michael Macon, to discuss a possible business relationship. Am. Compl. ¶¶ 21-22. Shortly before the meeting, the parties executed a Non-Negotiable Confidential Disclosure Agreement (the "NDA"). *Id.* ¶ 23; *see also* ECF No. 15-2 ("Wright Decl.") App. 1, at 5-6 (copy of NDA).[1] The NDA provided, among other things, that the parties would not disclose any "Confidential Information," defined as "certain confidential information relating to copier and printer cost recovery service." Wright Decl. App. 1, at 5. The NDA further provided that the parties would "only use the Confidential Information to the extent necessary to achieve or advance the Purpose," defined as "explor[ing] business opportunities of mutual interest." *Id.*; *see* Am. Compl. ¶ 25.

According to CopyWatch's Amended Complaint, Red Cross agreed during the June 2015 meeting that CopyWatch "would provide its services to [Red Cross], including auditing [Red Cross's] document expense costs for all copiers . . . , multi-functional devices, and printers." Am. Compl. ¶ 28. The parties also agreed that CopyWatch would prepare a written audit report detailing Red Cross's costs and proposing strategies for reducing them. *Id.* ¶ 29. Moreover, CopyWatch alleges, Red Cross agreed that it would handle all information arising from the audit "in accordance with the NDA" and that CopyWatch "would be paid," although the parties did not reach an agreement regarding the specific terms of payment. *Id.* ¶¶ 30-31.

[1] Because the Wright Declaration filed in support of Red Cross's motion to dismiss encompasses several documents, all citations to the Declaration refer to the page numbers generated by ECF.

After the June 2015 meeting, Macon allegedly "sent correspondence to CopyWatch reflecting that [Red Cross] understood that CopyWatch expected to be compensated for its services" and "confirming that CopyWatch would begin work while the parties worked out payment terms." *Id.* ¶ 32. CopyWatch claims that it relied on these commitments in pursuing its work, which included talking to copier and printer vendors. *Id.* ¶¶ 33-37. Red Cross has attached what it represents is the Macon email to its motion to dismiss. *See* Wright Decl. App. 3, at 12.

CopyWatch's original complaint described the interactions between the parties in the summer of 2015 somewhat differently. As set forth in the original complaint, the parties reached their understanding that CopyWatch would perform the audit not at the June 2015 meeting, but on "August 10, 2015." *See* ECF No. 1 ("Orig. Compl.") ¶ 25. According to Red Cross, this was an implicit reference to a Memorandum of Understanding (the "MOU") executed by the parties on that same date. *See* Def.'s Br. at 5. Red Cross has now attached the MOU to its motion to dismiss. Wright Decl. App. 2, at 8-10.

According to its terms, the MOU was "an expressly non-binding set of understandings" between CopyWatch and Red Cross. *Id.* at 8. The MOU explained that CopyWatch would prepare its audit report and that each party "intend[ed] to be solely responsible for its own costs incurred in connection with its efforts under this MOU." *Id.* The MOU further stated that the parties' exchange of confidential information would be governed by the previously executed NDA. *Id.* Article VII of the MOU read as follows:

> This MOU simply memorializes the Parties' current intent and does not constitute a legally binding agreement of the Parties to consummate any transaction outlined herein nor does it create any legal obligations on or provide any rights in favor of the Parties. If further discussions and negotiations occur, neither Party to the proposed transactions will be under any legal obligation with

> respect to the proposed transactions or any similar transactions unless and until the final, written agreements providing for the transaction have been executed and delivered by all Parties intending to be bound. No offer, commitment, estoppel, undertaking or obligation of any nature whatsoever shall be implied in fact, law or equity until such final written agreements have been executed and delivered.
>
> The Red Cross in its sole discretion shall decide whether or not to pursue any recommendations made by CopyWatch.

*Id.* at 9-10. Article VIII stated that the MOU "supersede[d] all prior agreements and understandings" related to the same subject matter. *Id.* at 10. The MOU concluded by reiterating: "Intending not to be bound by anything herein, the Parties intend this MOU to be a memorialization of their current intent and an aid to any future negotiations." *Id.*

The Amended Complaint claims that, on October 16, 2015, CopyWatch delivered its audit report, which explicitly stated that it was "confidential." Am. Compl. ¶ 38. The report, by applying CopyWatch's "unique and proprietary industry expertise and know-how," allegedly told Red Cross how it could "substantially reduce its document expenses." *Id.* ¶ 39. Red Cross has filed a copy of the audit report under seal. ECF No. 11 ("Audit Report").

After delivering the report, CopyWatch claims, it provided Red Cross with further helpful advice. Red Cross's Chief Information Officer allegedly "thanked CopyWatch for the 'great' report" and asked several follow-up questions "concerning how CopyWatch would execute its plan." Am. Compl. ¶ 44. In response, CopyWatch provided additional "details concerning execution of the strategies outlined in the Report." *Id.* CopyWatch also delivered a "draft lease buyout letter" that Red Cross could send to its current vendor. *Id.* ¶ 45. CopyWatch claims that it had contacted the vendor directly over the previous months to negotiate better terms for Red Cross. *Id.* ¶ 47.

CopyWatch alleges that Red Cross subsequently "us[ed] and rel[ied] on CopyWatch's audit analysis and findings to seek reduced copying and document expenses." *Id.* ¶ 55. In addition, Macon allegedly sent the lease buyout letter CopyWatch had drafted to Red Cross's vendor. *Id.* ¶ 46. CopyWatch further claims that Red Cross's Director for Decision Support and Business Planning "made an unsolicited telephone call" to CopyWatch's president "boasting that, since having CopyWatch's work product, [Red Cross] had been able to drive down its cost-per-copy rate to 2.7 cents." *Id.* ¶ 56. According to CopyWatch, that represented a total cost savings of over $15 million. *Id.* ¶ 57. CopyWatch's customary 30% fee would have therefore earned it over $4.5 million, and in May 2016, CopyWatch sent an invoice to Red Cross for that amount. *Id.* ¶ 60. Red Cross has attached what it represents is a copy of the invoice to its motion to dismiss. Wright Decl. App. 5, at 16-17.

Red Cross refused to pay. According to CopyWatch, Red Cross had in fact schemed to avoid payment starting shortly after it began using CopyWatch's work product. Macon left Red Cross around that time, and CopyWatch asserts on "information and belief" that Red Cross "fired Mr. Macon as part of [Red Cross's] attempt to use CopyWatch's audit, analysis, and recommendations without compensating CopyWatch." Am. Compl. ¶ 50. CopyWatch claims it sought to "finalize payment terms" with other Red Cross employees, *id.* ¶ 51, who "continued to seek and accept CopyWatch's services while stringing CopyWatch along" with respect to those terms, *id.* ¶ 53.

In the Amended Complaint, CopyWatch has brought three claims for relief under District of Columbia law. In Count I, it claims that Red Cross violated the NDA by "exploit[ing] CopyWatch's confidential and proprietary know-how, analysis, work product, and strategies for its own personal gain . . . without permission from CopyWatch." *Id.* ¶ 65. In Count II,

CopyWatch claims that its dealings with Red Cross gave rise to an "implied-in-fact contract" that Red Cross breached by refusing to pay for CopyWatch's services. *Id.* ¶¶ 68-76. Similarly, in Count III, CopyWatch claims in the alternative that Red Cross unjustly enriched itself by retaining the benefit of CopyWatch's services without paying for them. *Id.* ¶¶ 77-82.

Red Cross has moved to dismiss all three claims. ECF No. 15. Red Cross argues that CopyWatch's allegations that it breached the NDA are too conclusory to survive a motion to dismiss. *See* Def.'s Br. at 8-11. Red Cross further argues that CopyWatch's claims for breach of an implied-in-fact contract and unjust enrichment are untenable because express contracts (the NDA and the MOU) govern the parties' relationship. *See id* at 11-13. Finally, Red Cross argues that Counts II and III each fail to state a claim. *See id.* at 14-20.

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) "tests whether a plaintiff has properly stated a claim." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 24 (D.D.C. 2015). "A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor." *Id.* Nonetheless, the complaint must set forth enough facts to "state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"District courts may refer to materials outside the pleadings in resolving a 12(b)(6) motion" only if they "convert the motion to dismiss into one for summary judgment." *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011); *see* Fed. R. Civ. P. 12(d). In that event, "district courts must provide the parties with notice and an opportunity to present evidence in support of their respective positions." *Kim*, 623 F.3d at 719. Otherwise, the district court must ignore materials outside the pleadings that the parties introduce. *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017). Certain documents nonetheless fall "within the

pleadings," including any "written instrument that is an exhibit to a pleading." Fed. R. Civ. P. 10(c). Courts may also consider other documents "whose authenticity is not disputed" if "they are referred to in the complaint and are integral" to the plaintiff's claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). In addition, courts may take judicial notice of certain public records. *See Hurd*, 864 F.3d at 686.

## III. Analysis

Because CopyWatch has adequately stated its claims, Red Cross's motion to dismiss will be denied. The Court will begin by considering which documents are within the pleadings and thus properly considered on this 12(b)(6) motion. It will then analyze each count of CopyWatch's Amended Complaint in turn.

### A. Documents Within the Pleadings

Red Cross has submitted five documents in connection with its motion to dismiss. The first, the NDA, is properly before the Court on this motion. "The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). Such a contract "is 'integral' to the plaintiff's claim—it 'form[s] the basis for a claim or part of a claim.'" *Id.* (alteration in original) (quoting *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004)). Count I of the Amended Complaint alleges a breach of the NDA, and CopyWatch has not challenged the authenticity of the copy submitted by Red Cross. Therefore, the Court will consider the text of the NDA in deciding the motion.

Red Cross has also submitted a copy of the MOU. That document, however, is not within CopyWatch's pleadings. It is not "referred to" in the Amended Complaint, nor is it "integral" to CopyWatch's claims. *Id.* Only Count I is based on a written contract: the NDA. Counts II and III do not seek to enforce any written agreement, but rather seek to impose

liabilities based on Red Cross's conduct. Thus, even though the MOU "may well prove dispositive" as to some or all of CopyWatch's claims, it cannot justify dismissal at this stage. *Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d 16, 46-47 (D.D.C. 2006).

Red Cross contends that the MOU was referenced in CopyWatch's original complaint and therefore can be considered on this motion. Red Cross's argument proceeds in two steps. First, it argues, the Amended Complaint "directly contradicts the facts set forth in [CopyWatch's] original complaint" with respect to the MOU, and so the Court should strike the discredited allegations in the Amended Complaint and look to the original complaint instead. Def.'s Br. at 5 (quoting *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171 (D.D.C. 2013), *aff'd*, 796 F.3d 1 (D.C. Cir. 2015)). Second, Red Cross asserts that the original complaint clearly references the MOU by describing an agreement reached on August 10, 2015 (the date of the MOU) with the same subject matter as the MOU. *See id.* at 5-6.

Red Cross's argument founders at the first step. While the Court may strike "sham" allegations that represent a "180 degree change" from the original complaint, the amendments in this case are not so extreme. *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 26-27 (D.D.C. 2015). CopyWatch's original complaint alleged that it agreed on August 10, 2015, to perform an audit for Red Cross. Orig. Compl. ¶¶ 25-26. In its Amended Complaint, CopyWatch omits any reference of an agreement reached on August 10, 2015, and instead alleges that a similar agreement to perform an audit occurred at the earlier June 2015 meeting. Am. Compl. ¶¶ 28-31. Red Cross may well be correct that this amendment represents gamesmanship, an effort on CopyWatch's part to prevent the Court from considering the MOU in connection with this motion. But the "argument that the changes in [CopyWatch's] amended complaint rise to the level of direct contradiction overstates the changes [CopyWatch] has made." *Clay*, 128 F. Supp.

3d at 27. It is conceivable that the parties reached an understanding regarding the audit report in the June 2015 meeting and reaffirmed it in August 2015, when the MOU was executed. Thus, the allegations in both complaints could be true, and the amendment "does not fundamentally change the nature of Plaintiff's allegations." *Id.* Accordingly, no part of the Amended Complaint will be stricken, and the entire document remains CopyWatch's operative pleading.

For that reason, the Court must follow the "hornbook law that an amended complaint supersedes the prior complaint and renders it of no legal effect." *Halldorson v. Sandi Grp.*, 934 F. Supp. 2d 147, 156 (D.D.C. 2013). While the original complaint remains part of the record and may be examined by the Court to the extent it is helpful in interpreting the allegations in the Amended Complaint, *see W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001), the MOU is within the pleadings only if it is "integral" to the claims in the Amended Complaint, *Banneker Ventures*, 798 F.3d at 1133-34. Moreover, the Amended Complaint remains entitled to a presumption of truth at this stage of the proceedings. *See Clay*, 128 F. Supp. 3d at 26-27. If an agreement to perform the audit occurred in June 2015, as CopyWatch now alleges, then the Court cannot conclude that the MOU is integral to its claims. Therefore, the MOU is not within the pleadings.

The remaining three documents consist of an email from Macon to CopyWatch dated July 6, 2015, Wright Decl. App. 3, at 12; the Audit Report (which has been filed under seal); and an invoice that CopyWatch sent to Red Cross in May 2016, Wright Decl. App. 5, at 16-17. The Court will assume, without deciding, that those documents are within the pleadings, because they do not compel dismissal of CopyWatch's claims, as explained below.

### B. Count I: Breach of the NDA

Under District of Columbia law, CopyWatch must establish four elements to prevail on its claim for breach of contract: "(1) a valid contract between the parties; (2) an obligation or

duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). CopyWatch alleges that Red Cross breached its obligations under the NDA by exploiting CopyWatch's confidential information for financial gain, thereby depriving CopyWatch of "lost income for its services." Am. Compl. ¶¶ 62-67. Red Cross does not dispute that the NDA is a valid contract between the parties, or that the contract obligated Red Cross not to use CopyWatch's confidential material. Red Cross does, however, argue that CopyWatch has not adequately alleged a breach of that duty or damages. *See* Def.'s Br. at 9-11. The Court disagrees.

First, Red Cross argues, the Audit Report does not constitute confidential information protected by the NDA because the report was not proprietary and amounted to nothing more than a "sales pitch." *Id.* at 10. But the NDA does not clearly exclude nonproprietary information or "sales pitches" from "Confidential Information," which is defined as "certain confidential information relating to copier and printer cost recovery service." Wright Decl. App. 1, at 5. CopyWatch alleges that the Audit Report met that definition: the report was marked as "confidential" and explained how Red Cross could reduce its copying and printing costs. *See* Am. Compl. ¶¶ 38-41. The Court has also examined the Audit Report itself, which Red Cross has filed under seal, and its contents do not make those allegations implausible. *See* Audit Report. Plausibility is enough at this stage. *See Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 343-44 (D.D.C. 2011) (holding plaintiff had plausibly alleged that information fell within scope of confidentiality agreement). Of course, it will ultimately be CopyWatch's burden to show that the Audit Report was among the "*certain* confidential information" that the parties intended to protect. Wright Decl. App. 1, at 5 (emphasis added).

Red Cross next argues that CopyWatch has not adequately alleged that Red Cross actually used any confidential information in violation of the agreement. Def.'s Br. at 8-9, 10-11. CopyWatch's allegations, Red Cross argues, are too conclusory to "nudge[] [its] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court disagrees, because the Amended Complaint specifically alleges that a Red Cross employee called CopyWatch's president "boasting that, since having CopyWatch's work product, [Red Cross] had been able to drive down its cost-per-copy rate to 2.7 cents." Am. Compl. ¶ 56. Red Cross argues that this conversation merely speaks to Red Cross's "separate negotiation with its vendor" and that the cost savings were not necessarily "due either to CopyWatch or to the contents of its report." Def.'s Reply at 5-6. But the employee's alleged statement—that Red Cross had reduced its costs "since having CopyWatch's work product"—clearly supports an inference that Red Cross had won those savings by using CopyWatch's report and other confidential advice.

Finally, Red Cross argues, CopyWatch has not adequately pleaded damages caused by the breach. Def.'s Br. at 10-11. In Red Cross's view, because the NDA disclaimed "any expectation of a business relationship," CopyWatch has no right to the profits that it expected to earn from a future business relationship as damages. *See id.* The Court concludes that this argument does not warrant dismissal of CopyWatch's claim at this stage.

"The damages recoverable in a breach of contract action include those damages which 'arise directly from the breach itself, or could reasonably have been in contemplation of both parties when they made the contract.'" *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 238 (D.D.C. 1996) (quoting *Howard Univ. v. Baten*, 632 A.2d 389, 392 (D.C. 1993)). When all inferences are drawn in CopyWatch's favor, the Amended Complaint adequately

alleges that CopyWatch's lost income constituted damages within the contemplation of the parties. The NDA allowed the parties to use each other's confidential information only "to the extent necessary" to "explore business opportunities of mutual interest." Wright Decl. App. 1, at 5. And CopyWatch's business model, which it allegedly explained in advance of its first meeting with Red Cross, is to provide its advice and assistance in exchange for payment. *See* Am. Compl. ¶¶ 11-17, 27. The agreement can therefore be plausibly read to reflect an understanding that Red Cross would not use CopyWatch's confidential information for its own benefit without first securing CopyWatch's consent by agreeing to pay, and that damages for breach would include some form of compensation for unauthorized use. In an analogous situation, the Seventh Circuit has suggested that the plaintiff might be able to recover "the amount an unauthorized user of proprietary information would have agreed to pay if negotiating in good faith." *Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777, 786 (7th Cir. 2013) (applying Wisconsin law). *But see Document Sec. Sys., Inc. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 496-97 & n.35 (W.D.N.Y. 2014) (concluding that the type of damages discussed by the *Vojdani* court is unavailable under New York law unless the contract specifically provides for it). Regardless of whether CopyWatch can ultimately make out such a theory, "[e]ven where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages." *Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013); *see Alston v. Flagstar Bank, FSB*, 609 F. App'x 2, 3 (D.C. Cir. 2015). For these reasons, CopyWatch has plausibly alleged damages and the other elements of its claim for breach of the NDA.

**C. Count II: Breach of Implied-in-Fact Contract**

An implied-in-fact contract, as is alleged in Count II, "is a true contract that contains all the required elements of a binding agreement." *See New Econ. Capital, LLC v. New Markets*

*Capital Grp.*, 881 A.2d 1087, 1095 (D.C. 2005) (quoting *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C. 1996)). That is, "all the necessary elements of an express contract—including offer, acceptance, and consideration—must be shown in order to establish the existence of an implied-in-fact contract." *Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C. 2000). In addition, the following must be established:

> (1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the [person rendering the services] expected to be paid by him or her.

*Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 62 (D.C. 2005) (alteration in original) (quoting *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993)); *accord Berry Law PLLC v. Kraft Foods Grp., Inc.*, 777 F.3d 505, 508 (D.C. Cir. 2015).

Red Cross argues that Count II runs afoul of the principle that "a plaintiff may not obtain extra-contractual remedies through equitable claims when an actual contract governs the subject matter of a dispute." Def.'s Br. at 12 (emphasis omitted). Red Cross further argues that CopyWatch has failed to plead the elements required to prove an implied-in-fact contract. *See id.* at 14-17. The Court will consider each argument in turn.

### 1. Effect of Written Contracts

According to Red Cross, two written contracts preclude Count II of the complaint: the NDA and the MOU. As an initial matter, a written agreement does not always preclude the formation of an implied-in-fact contract. Cases are legion holding that "where the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties." *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996). But that principle relates to extra-contractual duties

imposed under an equitable theory of unjust enrichment. *See id.* at 1383. An implied-in-fact contract is, by contrast, a true contract between the parties. *See id.* Under the right circumstances, the terms of a written contract can be supplemented with terms implied from the parties' conduct. *See id* at 1384.

Even if it applies, the principle that Red Cross invokes here does not preclude Count II. It is generally true that "a claim for *quantum meruit* cannot stand where there is an express written agreement between the parties," but only if the agreement concerns "the same subject matter." *Cobell v. Jewell*, 234 F. Supp. 3d 126, 159 (D.D.C. 2017). The NDA does not appear to concern the same subject matter as the contract alleged in Count II. That written agreement does not directly address the key aspect of this claim: CopyWatch's compensation. Rather, the NDA was expressly intended to protect the parties while they negotiated a separate agreement that would govern payment for CopyWatch's services. *See* Wright Decl. App. 1, at 5 (explaining that the parties "wish to explore business opportunities of mutual interest"); Def.'s Br. at 11 ("[T]he NDA itself expressly disclaimed that it created a business relationship, or any expectation of a business relationship, between Red Cross and CopyWatch."). According to CopyWatch, the implied-in-fact contract underlying Count II is that separate agreement.

If CopyWatch is able to prove damages for breaches of both the NDA and the alleged implied-in-fact contract, those damages may overlap to some extent—but not necessarily completely. For example, CopyWatch alleges that it prepared "a draft lease buyout letter for [Red Cross] to send to its current vendor," and provided contact information for the vendor's "Vice President of Sales." Am. Compl. ¶ 44. If CopyWatch in fact authorized Red Cross to send the agreement to the vendor, as one could infer from the facts alleged in the Amended Complaint, then it presumably would not have constituted confidential information within the

scope of the NDA. Nonetheless, CopyWatch's work on the letter could potentially constitute services compensable under Count II. As that example shows, "without the benefit of discovery, it is not yet clear whether the activities at issue in the [implied-in-fact contract and] unjust enrichment claim[s] against [Red Cross] overlap entirely with the breach of contract claim" in Count I. *Dist. Title v. Warren*, No. 14-cv-1808 (ABJ), 2015 WL 12964657, at *10 (D.D.C. June 1, 2015). Therefore, the Court declines to dismiss Count II on this ground.

Red Cross also invokes the MOU as a written agreement barring Count II. As explained above, the MOU is not properly before the Court on this motion to dismiss. Moreover, even if it were before the Court, Red Cross's argument would have no purchase because it is not at all clear that the MOU is an agreement. This is so because the document, on its face, does not unambiguously evince a key element of contract formation: "intention of the parties to be bound" by at least some of its terms. *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 337-38 (D.C. 2015) (quoting *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985)). Rather, the document is internally inconsistent on this point. At times it appears to provide for a binding obligation: "[n]o offer, commitment, estoppel, undertaking or obligation of any nature whatsoever *shall* be implied in fact, law or equity until . . . final written agreements have been executed and delivered." Wright Decl. App. 2, at 9 (emphasis added). Elsewhere, however, the MOU states that *none* of its terms, apparently including the foregoing, are binding. *See id.* at 8, 9, 10. In an analogous case—where one party attempted to enforce a right of first refusal contained in a nonbinding letter of intent—another court concluded that the document was ambiguous, requiring the court to "go beyond the four corners" of the document to determine whether the right of first refusal was binding. *See Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 335 (S.D.N.Y. 1999) (Chin, J.).

Similarly, this Court could not determine on a motion to dismiss whether the parties intended to be bound by any of the MOU's terms, even if the MOU were before the Court.

Therefore, at this stage the Court cannot conclude that any written agreement between the parties compels dismissal of Count II of the Amended Complaint. For the same reasons, this argument must be rejected as to Count III as well.

**2. Formation of an Implied-in-Fact Contract**

Because no written agreement requires dismissal of Count II, the Court turns to consider whether CopyWatch has properly pleaded the existence of an implied-in-fact contract. According to Red Cross, CopyWatch has failed to plausibly allege three elements of an implied-in-fact contract: that CopyWatch rendered "valuable services"; that the Red Cross "accepted," "used" and "enjoyed" those services; and that Red Cross did so "under such circumstances as reasonably notified [Red Cross] that [CopyWatch] expected to be paid." *Jordan Keys*, 870 A.2d at 62; *see* Def.'s Br. at 14-15.

Red Cross's argument, however, is largely grounded in the MOU. If that document were in fact within the pleadings, it might very well compel the dismissal of Count II. That is because the MOU, even if not a binding contract, clearly states that Red Cross did not intend to be bound to compensate CopyWatch for its work until the parties executed a final agreement. *See* Wright Decl. App. 3, at 9; *Berry Law*, 777 F.3d at 508 (holding there was no reasonable expectation of payment where the defendant clearly communicated that the work in question was preliminary and would not be compensated); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71-73 (2d Cir. 1989) (holding that, despite "considerable partial performance," there was no contract where the parties had clearly manifested an intent not to be bound absent a final written agreement); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012) ("A contract may not be implied in fact from the conduct of the parties where it

appears that they intended to be bound only by a formal written agreement." (quoting *Valentino v. Davis*, 703 N.Y.S.2d 609, 612 (App. Div. 2000)). But the MOU is not before the Court, and so this argument cannot prevail.

Rather, the Amended Complaint plausibly alleges that Red Cross accepted CopyWatch's services with the understanding that it would have to pay for them. CopyWatch alleges that, starting in June 2015 when the parties first met, Red Cross understood that CopyWatch expected to be paid, although the parties had not yet agreed on "potential payment structures." Am. Compl. ¶ 31. Macon allegedly sent correspondence to CopyWatch reflecting that understanding. *Id.* ¶ 32. Moreover, just when CopyWatch was about to "finalize payment terms" with Macon, it discovered that Macon had mysteriously left Red Cross—from which CopyWatch infers that Red Cross had sought to avoid its commitments to pay CopyWatch by firing the person in the organization who had most clearly expressed those commitments. *Id.* ¶¶ 48-50. CopyWatch then reached out to other Red Cross employees, who allegedly "continued to seek and accept CopyWatch's services while stringing CopyWatch along with respect to payment terms." *Id.* ¶ 53. That alleged course of dealing makes this case similar to others in which the defendant provided "'verbal assurances' that [the plaintiff] would be compensated for consulting services." *New Econ. Capital*, 881 A.2d at 1098. The Amended Complaint thus pleads sufficient facts to plausibly allege that Red Cross was on notice that CopyWatch expected to be paid at the time it accepted and used CopyWatch's work.

Red Cross points to the Macon email dated July 6, 2015, which it has attached to its motion to dismiss, as evidence that the Amended Complaint does not sufficiently allege that CopyWatch ever reasonably expected payment. Wright Decl. App. 3, at 12. In particular, it argues that the document suggests that Red Cross did not accept CopyWatch's customary 30%

fee and wanted to "discuss different payment structures." *Id.* But other statements in the email are ambiguous. Macon also appears to memorialize an agreement "that the process could start under a MOU, while the parties discuss the contract terms." *Id.* That is plausibly consistent with CopyWatch's account, according to which Red Cross had not yet agreed to particular payment terms, but nonetheless understood that it would eventually have to pay. *See* Am. Compl. ¶ 31. Thus, the email does not undermine CopyWatch's claims. Nor does the Court agree that, because CopyWatch failed to send an invoice until May 2016, Red Cross could not have been on notice earlier that it was expected to pay. *See* Def.'s Br. at 17 (citing Wright Decl. App. 5, at 16-17).

Red Cross suggests, in its reply, that the "agreement" to provide audit services in June 2015 failed to include the amount of compensation, a material term of a contract. *See* Def.'s Reply at 4. That argument is of no moment because CopyWatch does not allege that an oral contract formed at the June 2015 meeting, or ever. Rather, CopyWatch alleges that the meeting put Red Cross on notice that it would have to pay for CopyWatch's services, and that an implied-in-fact contract formed later when Red Cross actually accepted and benefitted from CopyWatch's services. CopyWatch will, however, ultimately have to show that discussions of payment terms were sufficiently advanced by then that Red Cross can be considered to have agreed to definite terms of compensation. *See Queen v. Schultz*, 747 F.3d 879, 884-86 (D.C. Cir. 2014).

Red Cross also misses the mark when it argues that CopyWatch has failed to plausibly allege that it provided "valuable services." Def.'s Br. at 17. Red Cross relies primarily on the Audit Report, which it characterizes as "sales pitch efforts . . . expended to earn Red Cross's eventual business." *Id.* But an examination of the Audit Report (filed under seal) does not, at

this stage of the litigation, compel the conclusion that the parties understood it as nothing more than a sales pitch. Rather, for purposes of this motion, the Court must accept as true CopyWatch's allegation that the audit in fact constituted substantial and valuable work and was understood as such. *See* Am. Compl. ¶¶ 28-31, 38. The parties may revisit their dispute over how to characterize the Audit Report after discovery.

Finally, Red Cross argues that it never used and benefitted from the services that CopyWatch provided. But for the same reasons explained above in connection with Count I, CopyWatch plausibly alleges just that. Therefore, Count II survives Red Cross's motion to dismiss.

**D. Count III: Unjust Enrichment**

Red Cross advances essentially the same arguments regarding CopyWatch's unjust enrichment claim. It first argues that written agreements preclude the claim. *See* Def.'s Br. at 11-13. That argument fails for the same reasons set forth above in connection with Count II. Nor is the Court convinced by Red Cross's argument that CopyWatch has failed to plead the elements of unjust enrichment, as explained below.

Count III is based on a theory of "quasi-contract," which "is not a contract at all" but rather a "duty thrust under certain conditions upon one party to requite another." *New Econ. Capital*, 881 A.2d at 1095 (quoting *Fred Ezra*, 682 A.2d at 176). It is necessarily pleaded in the alternative to Count II, because if an enforceable contract exists (whether express or implied), then an equitable remedy is neither needed nor warranted. *See, e.g.*, *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 190-91 (D.D.C. 2016). "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Bregman v. Perles*,

747 F.3d 873, 876 (D.C. Cir. 2014) (quoting *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008)).

Count III is properly pleaded for the essentially same reasons as is Count II: CopyWatch plausibly alleges that it conferred a benefit (its audit report and other services) on Red Cross, that Red Cross retained that benefit (by using the services to reduce its copying and printing expenses), and that Red Cross's retention of the benefit is unjust (because it avoided paying for CopyWatch's services despite knowing that CopyWatch expected payment). Red Cross's primary arguments for dismissing this claim are that CopyWatch's audit report was nothing more than a sales pitch and that Red Cross never actually used the report for its own benefit. *See* Def.'s Br. at 18-20. Those arguments have already been discussed, and rejected, above.

## IV. Conclusion and Order

For all of the above reasons, it is hereby **ORDERED** that Red Cross's Motion to Dismiss (ECF No. 15) is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 12, 2018